106 P.3d 401

**WEST WOOD INVESTMENTS, INC., a Washington corporation, Plaintiff–Appellant–Cross Respondent,**

v.

**Glenn D. ACORD and Elizabeth D. Acord, husband and wife; Robert E. Alderson and Janell J. Alderson, husband and wife; John E. Almerico and Antoinette M. Almerico, husband and wife; Donald R. Andrews, Sr. and Joyce B. Andrews, husband and wife; The Jeffrey P. Baker Trust, Jeffrey P. Baker, Trustee; Dale L. Beck and Sandra S. Beck Revocable Living Trust, Dale L. Beck and Sandra S. Beck, Trustees; William C. Bostrom Qualified Personal Residence Trust Agreement, William C. Bostrom, Trustee; Melinda K. Bowman, a single person; Karin L. Brier, a single person; Robert F. Broyles and Marsha R. Broyles, husband and wife; The Living Trust of James A. Clark and Doreen M. Clark, James A. Clark and Doreen M. Clark, Trustees; Rosemarie Conklin Trust; Rosemarie Conklin, Trustee; Allen B. Davis and Joyce S. Davis, husband and wife; Mike Divito, a single man, Mary Louise Divito and John Doe Divito, husband and wife; Roswell F. Doty, Sr., a single person; Arthur J. Maruno, a single person; Walter S. Aman and Ruby M. Aman, husband and wife; Eleanor Fahrenwald Amended 1980 Revocable Trust; Donald Frederick Miller and Jung Won Miller, husband and wife; Peter J. Ficalora and Mary Lou Ficalora, husband and wife; Oren L. Flolo and Charlene H. Flolo (a/k/a Sharlene H.**

76

Flolo), husband and wife; Howard W. Froman and Norma J. Froman, husband and wife; G.W. Gregory and Patrice D. Gregory, husband and wife; Mark T. Kinley, a single person; William P. Werschler and Kara Werschler, husband and wife; James and Patricia Kryger Living Trust, Eugene Arthur Kryger and Patricia Lynn Kryger, Trustees; Robert A. Magonigle and Barbara G. Magonigle (a/k/a Barbara B. Magonigle), husband and wife; Trust "A" of the Burgess and Virginia Mc Donald Family Trust, Virginia S. Mc Donald, Trustee; Trust "B" of the Burgess and Virginia Mc Donald Family Trust, Virginia S. Mc Donald, Trustee; The Mc Manus Family Revocable Trust Declaration, George E. Mc Manus and Theresa Ann Mc Manus, Trustees; Paul R. Nolan and Donna M. Nolan, husband and wife; John O. Nord and Angeline M. Nord (a/k/a Angelina M. Nord), husband and wife; Glenn B. Owen and Sandra M. Owen, husband and wife; William P. Owen and Dulcy L. Owen, husband and wife; William T. Pochis and Jan M. Pochis, husband and wife; Joseph R. Rimsa and Lisa K. Rimsa, husband and wife; Joseph R. Schwehr and Dianne R. Schwehr (a/k/a Diane R. Schwehr), who are married to each other; The Shortridge Family Trust, Charles R. Shortridge and Helen M. Shortridge, Trustees; Christopher H. Nienstedt, a married man as his sole and separate property; M. Elaine Szanto, a married woman as her sole and separate property; Stanley A. Toelle and Beverly J. Toelle, husband and wife; Danielson Revocable Family Trust; Dale L. Van Zandt, an unmarried man; Elizabeth M. Flaherty, an unmarried woman; James Peter Winter and Christine Marie Winter, who are married to each other; Ray L. Shulund (a/k/a Ray L. Shuland) and Amy M. Shulund (a/k/a Amy M. Shuland), husband and wife; Ben and Joan Costantino Revocable Trust (a/k/a Ben and Joan Costantino Revocable Trust), Ben B. Costantino and Joan C. Costantino, Trustees; Federal Home Loan Mortgage Corporation; Larry D. Large, a single man; Diane K.

Brooke and Joseph T. Walsh, husband and wife; Engene M. Smith and Betty L. Smith, husband and wife; Wang Living Trust, Chung–Chi Wang and Mei–Ein Wang, Trustees; Max J. Kuney, III and Shelly A. Kuney, husband and wife; Drennon L. Adams and Gloria J. Adams, husband and wife; George Laiblin and Carolyn Laiblin, husband and wife; Wesley L. Delaney and Margaret E. Delaney, husband and wife; Robert H. Fredricks and Betty J. Fredricks, husband and wife; Kenneth A. Thomas and Judith L. Thomas, husband and wife; Worldmark, The Club, a California non-profit mutual benefit corporation; Arrow Point Development Company, Inc., an Idaho corporation; Arrow Point Community Association, Inc., an Idaho non-profit corporation; Trendwest Resorts, Inc., an Oregon corporation; and John and Jane Does 1–100, and any other persons who claim interest in and to the real property described in Exhibit "1", Defendants–Third Party Plaintiffs–Cross Respondents–Cross Appellants,

and

Arrow Point Village/Building A Association Inc., an Idaho non-profit corporation; Arrow Point Village/ Building B Association Inc., an Idaho non-profit corporation; Arrow Point Village/Building C Association Inc., an Idaho non-profit corporation; Arrow Point Village/Building D Association Inc., an Idaho non-profit corporation; Arrow Point Village Building F Association Inc., an Idaho non-profit corporation, Third–Party Plaintiffs–Respondents–Cross Appellants,

v.

Fortress, LLC, an Idaho limited liability company; West Wood Investments, Inc., a Washington corporation, Third–Party Defendants–Appellants–Cross Respondents.

No. 29779.

Supreme Court of Idaho, Coeur d'Alene, October 2004 Term.

Jan. 28, 2005.

Robert J. Fasnacht, P.C., Coeur d'Alene; Karr Tuttle Campbell, Seattle, WA, for appellants. Walter E. Barton argued.

Davison, Copple, Copple & Cox, Boise; Jones Gladhill Hess Fuhrman, Boise, for respondents. Terry C. Copple argued.

KIDWELL, Justice Pro Tem.

This is an appeal from a judgment and decree of foreclosure following a bench trial. The property at issue was part of a condominium project located along Coeur d'Alene Lake. The district court granted foreclosure on the real property at issue, but found equitable servitudes had been created and would run with the property. We affirm.

## I.

## FACTS AND PROCEDURAL BACKGROUND

Arrow Properties Partnership (APP) owned certain real property along Coeur d'Alene Lake. In the 1980s, APP intended to develop the property as a townhouse/condominium development. In 1981 APP received approval from Kootenai County for a planned unit development (PUD). This development was amended and approved in 1989 and 1990. In 1991, APP produced and recorded a set of covenants, conditions and restrictions (CC & Rs) for the development. These CC & Rs expressly contemplate that the development would include common area property owned by the association for the common use and enjoyment of the owners. No plat created by APP was ever recorded or is in the record before this Court.

In 1992, APP began to discuss with Roger Stewart a purchase and sale of the development. In September 1992, a Purchase and Sale Agreement was created to sell the development to Stewart Construction Company, Inc. This document recites that the purchaser was taking "All rights, duties, responsibilities, etc., of 'Declarant' as specified in the DECLARATION OF COVENANTS, CONDITIONS, AND RESTRICTIONS TO ARROW POINT PARK P.U.D., dated December 27, 1991." During this time, Arrow Point Development Co., Inc., (APDC) was created to become the owner of the development. Also during this time, APDC began planning its development of the property. Because of funding problems, the sale was not completed as planned.

Following further negotiations, a sale to APDC was completed during April 1993. On April 30, 1993, APP gave APDC a warranty deed for Lots 1 through 10 of the development, and Parcel A. In exchange, APDC executed a promissory note in favor of APP, in the amount of $2,237,756.23. An addendum to this promissory note was executed. The addendum to the promissory note sets forth additional terms of the transaction. It includes a repayment schedule by which APP's interest in the real property would be reconveyed to APDC, or APP's security interest would be released from the property, as payments were regularly made. Additionally, it prohibits APDC from developing on property subject to the security interest, except for infrastructure on Lot 10 and Parcel A, and improvements on Lot 5 allowed by separate agreement. APDC also executed a Deed of Trust, naming APP as beneficiary. The Deed of Trust is a grant with regard to Lots 1 through 10, but does not address Parcel A. APDC also executed an Addendum to the Deed of Trust. This addendum includes most of the terms of the addendum to the promissory note. Additionally, paragraph 1(d) of the addendum states, "In the event of foreclosure of this Deed of Trust, any such improvements completed on the property shall become the property of the Beneficiary." APDC also mortgaged the property to APP. Paragraph II(1)(d) of the Mortgage expressly states, "In the event of foreclosure of this Mortgage, any such improvements completed on the property shall become the property of the Mortgagee."

On May 10, 1993, APP executed a Declaration of Easement. The easement was given over Lot 10 of the development and Parcel A, in favor of Lots 1 through 9 of the development, Lots 1 through 17 of Arrow Point Park, and an additional parcel of property. Subsequent to the sale, APDC modified the plan for the development to become a condominium project. Modification of the development was approved by Kootenai County, in late 1993. The final plat of the development was filed in November, 1993.

On January 19, 1994, the trustee of the Deed of Trust reconveyed Lots 6 and 8 back to APDC. This conveyance included a nonexclusive easement over Lot 5, for recreational purposes. However, the reconveyance provided that if the promissory note

was defaulted upon, the easement would be restricted to Lot 5 minus its northern 300 feet. This reconveyance was done so that APDC could begin development of buildings A and B of the project. On March 11, 1994, APDC recorded master CC & Rs for the project. The master CC & Rs expressly recognized the CC & Rs recorded by APP and superceded the prior CC & Rs in their entirety. On April 11, 1994, APP and APDC joined in granting an easement over Lot 10 to Arrow Point Community Association, Inc., and Arrow Point Property Owners, Inc. Lot 9 was reconveyed on May 3, 1994, Lot 1 on March 1, 1995, along with the easement over Lot 5. Lots 3 and 4 were reconveyed on November 21, 1995, but the document does not include the easement over Lot 5. On June 15, 1995, a reconveyance of the access easement over Lot 10 was completed. Fee simple title to Lots 2, 5, 7 and 10 was never reconveyed to APDC.

The master CC & Rs recorded by APDC governed the entire project. Each condominium building was to have its own incorporated building association, and its own CC & Rs. The CC & Rs for Building A were recorded on November 16, 1994. CC & Rs for the other condominium associations were subsequently recorded. During or following this time, condominiums were sold to purchasers.

In 1995, APDC started development of Lot 5, even though it had not been released from the security interest or reconveyed pursuant to the deed of trust. Plans were drawn and meetings were held. Some communications were had between Gary Frame and APDC, but it is not clear if Gary was acting in his capacity as a partner of APP. Based on the evidence and testimony, it is certain that Gary Frame was consulted and APP had knowledge that APDC was engaged in the development of a pool and building on Lot 5. On September 5, 1996, a certificate of occupancy for the pool building was issued by Kootenai County.

On May 10, 1997, a record of survey was recorded with the Kootenai County Recorder's office. This survey is of Lot 5, done for the purpose of a lot line adjustment. The survey designates part of Lot 5 as an "infor-mation center" and the rest as "common area."

The promissory note came due in April, 1997. APDC defaulted on the note. Negotiations ensued in order to resolve the default. West Wood Investments, Inc., acquired the interest of APP through an assignment of the security documents. West Wood instituted a foreclosure action in 2001, against APDC and the associations, with regard to Lots 2, 5 and 7, and two other parcels of property that were not in the development. At some point the owners were joined in the action. West Wood sought a partial grant of summary judgment against the owners and associations, arguing that statutory law did not require them to be parties to the foreclosure, because their interests were not of record. The district court denied partial summary judgment. At some point West Wood acquired the interest of APDC, and APDC stipulated to foreclosure. The matter went to trial before the district court, sitting without a jury.

The district court issued a Memorandum Decision and Order on October 24, 2002. With regard to Lot 5, the district court found that Lot 5 was never released from the security agreement or reconveyed to the associations or owners, and West Wood could foreclose on Lot 5. However, the district court also found that APP would have been precluded from ignoring the equitable rights of the owners and associations if it were the party seeking foreclosure. Therefore, West Wood, as APP's successor in interest, was also precluded from doing so. With regard to Lot 10, the district court also found that no release or reconveyance was in evidence, and Lot 10 was subject to foreclosure. However, certain recorded easements burdened Lot 10 to the benefit of the other lots, and the foreclosure was subject to those easements. With regard to "Parcel A/Exhibit A," the district court agreed with West Wood that the issue of any easement was not properly tried to the court, and resolution of the nature and scope of any easement was premature.

On March 27, 2003, the district court issued a Supplemental Memorandum Decision, clarifying its findings with regard to Lot 5.

The court found that APDC had removed the northern 80' of Lot 5 from any equitable servitude, and did so with the knowledge of the owners and associations.

On May 23, 2003, the district court issued a Judgment and Decree of Foreclosure. The court granted foreclosure on Lot 5 subject to the equitable servitude in favor of owners and associations, giving them the exclusive use and benefit of the common area for both open space and the recreational pool facility, excepting the northern 80' strip which APDC had removed from common use. The court granted foreclosure on Lot 10, subject to existing recorded easements for access and common area infrastructure. With regard to "Parcel A/Exhibit A," the district court granted foreclosure of this property subject to existing easements for utilities. The district court also granted costs to the owners and associations, as the prevailing party. West Wood timely appealed. I.A.R. 14. The owners and associations timely cross-appealed. I.A.R. 15.

## II.

## STANDARD OF REVIEW

 Review of the findings of fact and conclusions of law reached by a trial court following a bench trial:

[I]s limited to ascertaining whether the evidence supports the findings of fact, and whether the findings of fact support the conclusions of law. A trial court's findings of fact in a court tried case will be liberally construed on appeal in favor of the judgment entered, in view of the trial court's role as trier of fact. It is the province of the district judge acting as trier of fact to weigh conflicting evidence and testimony and to judge the credibility of the witnesses. If the findings of fact are based on substantial evidence, even if the evidence is conflicting, they will not be overturned on appeal. However, we exercise free review over the lower court's conclusions of law to determine whether the court correctly stated the applicable law, and whether the legal conclusions are sustained by the facts found.

*Hardy v. McGill,* 137 Idaho 280, 285, 47 P.3d 1250, 1255 (2002) (quoting *Conley v. Whittlesey,* 133 Idaho 265, 269, 985 P.2d 1127, 1131 (1999)).

 Because imposition of an equitable remedy requires a balancing of the equities, which is inherently a factual determination, the district court's imposition of equitable servitudes should be reviewed for an abuse of discretion. *See Sword v. Sweet,* 140 Idaho 242, 92 P.3d 492 (2004) (stating "The magistrate court's decision concerning the application of the doctrines of part performance, equitable estoppel, promissory estoppel, laches and/or unclean hands is reviewed under the abuse of discretion standard.") Whether a district court abused its discretion is a three-pronged inquiry to determine whether the district court: (1) correctly perceived the issue as one of discretion; (2) acted within the boundaries of such discretion and consistently with the legal standards applicable to the specific choices before it; and (3) reached its decision by an exercise of reason. *Sun Valley Potato Growers, Inc. v. Texas Refinery Corp.,* 139 Idaho 761, 765, 86 P.3d 475, 482 (2004) (citation omitted). Absent a clear showing of abuse, a district court's exercise of discretion will not be overturned. *Id.* (citation omitted).

## III.

## ANALYSIS

A. **The District Court Did Not Err In Denying West Wood's Motion For Partial Summary Judgment.**

 Summary judgment is proper when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In a motion for summary judgment, this Court should liberally construe all facts in favor of the nonmoving party and draw all reasonable inferences from the facts in favor of the nonmoving party. Summary judgment must be denied if reasonable persons could reach differing conclusions or draw conflicting inferences from the evidence presented.

*Iron Eagle Dev., L.L.C. v. Quality Design Sys., Inc.,* 138 Idaho 487, 491, 65 P.3d 509, 513 (2003) (citations omitted); *see also Willie v. Bd. of Trustees,* 138 Idaho 131, 133, 59 P.3d 302, 304 (2002).

 Idaho Code § 6–101 addresses foreclosure actions. Section 6–101(4) states:

> No person holding a conveyance from or under the mortgagor of the property mortgaged, or having a lien thereon, which conveyance or lien does not appear of record in the proper office at the commencement of the action, need be made a party to such action; and the judgment therein rendered, and the proceedings therein had, are as conclusive against the party holding such unrecorded conveyance or lien as if he had been made a party to the action.

West Wood asserts that the Order of Foreclosure terminated all interests that were not of record when the foreclosure was commenced. However, West Wood reads I.C. § 6–101 too broadly in applying the statute to these facts.

 Idaho Code § 6–101 is addressed to "conveyances" and "liens" which have not been recorded at the time a foreclosure action commences. The statute mandates that a foreclosure judgment is conclusive against the parties holding unrecorded conveyances or liens. Although not made applicable to I.C. § 6–101, a "conveyance" is defined in Idaho Code Title 55, Chapter 8 as "[embracing] every instrument in writing by which any estate or interest in real property is created, alienated, mortgaged or encumbered, or by which the title to any real property may be affected, except wills." I.C. § 55–813. A lien has been defined as "a charge upon the property to secure the payment of a debt." *Middlekauff v. Lake Cascade, Inc.,* 103 Idaho 832, 834, 654 P.2d 1385, 1387 (1982) (*Middlekauff I* ) (citing *Sullins v. Sullins,* 65 Wash.2d 283, 396 P.2d 886, 888 (1964); *Matlow v. Matlow,* 89 Ariz. 293, 361 P.2d 648, 651 (1961)). The interest asserted by the Owners was an equitable interest, and one that had not yet been adjudicated. As such, it appears there was no mechanism for recording the asserted equitable interest.

West Wood also argues that any asserted interest was junior to the interest that was being foreclosed upon. This does not assist West Wood. West Wood's interest may have been older, superior and of record because of the recording of the security instruments, but that does not address the creation of equitable interests that may be enforceable against APP and its successors.

Idaho Code § 6–101 did not terminate the equitable interests asserted against West Wood. Genuine issues of material fact existed regarding the creation of equitable interests that may have been enforceable against West Wood, and the district court properly denied West Wood's motion for partial summary judgment.

**B. The District Court Did Not Abuse Its Discretion When It Found That Respondents Had Equitable Servitudes Affording Them Exclusive Rights And Use Of Lot 5.**

This case addresses whether common area allegedly created by a developer/mortgagor may establish an equitable interest in persons who purchase a unit in the project, and whether such interests are enforceable against the mortgagee's successor in interest.

 Equitable enforcement of covenants restricting the use of land was recognized in the common law of England after the middle of the Nineteenth Century. *Streets v. J M Land & Developing Co.,* 898 P.2d 377, 379 (Wyo.1995). Equitable servitudes are distinguished from covenants running with the land in that the latter should be of record, and a buyer takes with constructive knowledge, if not actual knowledge, of the existence of such recorded covenants and is thereby bound to the covenants. In *Streets* it is stated:

> The question [of enforceability] does not depend on whether the covenant runs with the land ... **if there was a mere agreement and no covenant [running with the land], this court would enforce it against the party purchasing with notice of it;** for if an equity is attached to the property by the owner, no one purchasing with notice of that equity can stand in a different situation from the party from who he purchased.

*Id.,* 898 P.2d at 379–80 (quoting *Tulk v. Moxhay* (1948), 2 Ph. 774 (41 Eng. Rep. 1143)) (emphasis added in quotation). Equitable interests may arise because of the actions of the parties, such as oral representations. *Middlekauff v. Lake Cascade, Inc.,* 110 Idaho 909, 913, 719 P.2d 1169, 1173 (1986) (*Middlekauff II* ). In *Middlekauff v. Lake Cascade, Inc.,* 103 Idaho 832, 654 P.2d 1385 (1982) (*Middlekauff I* ), this court established the test relevant to determining if a promise regarding the use of land runs against a successor in interest of the original promisor: 1) whether or not the party claiming the enforceable interest actually has an interest against the original promisor; and 2) if such right exists, whether it is enforceable against the subsequent purchaser. *Middlekauff I,* 103 Idaho at 834–35, 654 P.2d at 1387–88.

### 1. The owners and associations have an equitable interest enforceable against the original promisor.

■ West Wood claims that no equitable servitude could arise which would be enforceable against APP's successor in interest because APP recorded the security documents that clearly indicate that, in the event of default, any property not released from the security agreement or reconveyed back to APDC would be subject to foreclosure, and any improvements made to the property would be lost. West Wood asserts that the *Sun Valley* cases control resolution of the issue. *Sun Valley Hot Springs Ranch, Inc. v. Kelsey,* 131 Idaho 657, 962 P.2d 1041 (1998) (*Sun Valley I* ); *Sun Valley Land and Minerals, Inc. v. Hawkes,* 138 Idaho 543, 66 P.3d 798 (2002) (*Sun Valley II* ).

The Sun Valley cases stem from the development of a residential subdivision. The developer owned 320 acres of land and intended to develop it in two phases. The developer obtained a $400,000 loan for the development and gave a mortgage to secure the loan. The lender was a stranger to the land and was not involved in the development, except to the extent of lending money. The developer recorded a plat and CC & Rs. A lot designated as Lot 44 was sold to a purchaser and the lender released its mortgage interest in Lots 44 and 45. Eventually, the developer defaulted on the loan, the mortgagee foreclosed, and the mortgagee purchased the property at a sheriff's sale, not including Lots 44 and 45. Through several transactions, a successor in interest to the mortgagee acquired the foreclosed property.

In *Sun Valley I,* the successor to the purchaser of Lot 44 (the Ranch) brought an action against Kelsey, the successor of the purchaser at foreclosure. The Ranch claimed that Kelsey had an obligation to complete construction of the subdivision and to convey common area to lot owners. In affirming the district court's decision, this Court held that the mortgage was recorded before the plat and CC & Rs. The mortgagee's subsequent release of Lots 44 and 45, even with notice of the plat, CC & Rs and common scheme of development, did not disturb its mortgage interest. Moreover, the only actual notice to the mortgagee here was of the *intention* to create common areas, not of any common areas that were actually in existence. This Court noted that the purchasers were given notice that: 1) the property was burdened by a blanket mortgage in favor of the lender; 2) each purchaser could lose his financial interest in the property in the event of default by the developer; and 3) in the event of default, the foreclosing lender was not obligated to perform any agreements made with the purchasers. Based on the purchasers having knowledge of the risk inherent in the development, the purchasers had no equitable rights to assert against the foreclosing lender. This Court's opinion in *Sun Valley II* placed similar emphasis on the blanket mortgage and the purchaser's notice of the possibility of losing rights if the mortgage was foreclosed upon, in denying an assertion of equitable rights.

The instant case presents similar facts. APP recorded its security interest giving notice that, in the event of default, property subject to the deed of trust or mortgage would be foreclosed upon and improvements would be lost. At the time of foreclosure, Lot 5 was still subject to the deed of trust and mortgage. However, West Wood fails to recognize that APP is not in the position of the lender in the *Sun Valley* cases. In *Sun Valley,* the lender was a stranger to the

property prior to lending money to fund the development and taking back a mortgage. APP is not similarly situated.

In the 1980's, APP intended to develop the property with common areas. APP documented this intention through plans that illustrate common areas and by filing with the Kootenai County Recorder's Office master CC & Rs that expressly contemplate common areas to be owned by the associations for the use and benefit of owners. Eventually, APP sold the property to APDC, and retained a security interest, through a Deed of Trust, an Addendum to Deed of Trust, and a Mortgage. These documents have been recorded with the Kootenai County Recorder's Office. Under this security interest, APP stated that it would release parcels of property under certain conditions, but that in the event of default the parcels that had not been released and any improvements to those parcels could be lost through foreclosure. It is not disputed that this security interest was of record, and subsequent purchasers were on notice of the possibility of loss if default occurred. However, this does not eliminate the fact that APP engaged in representations of its own, prior to divesting itself of ownership of the property, that the development would include common areas, and was engaged in the development after selling the property to APDC.

In the instant case, APP comes to the mortgage as the prior owner and developer of a townhouse/condominium project that was to include common areas for the beneficial use of the owners and associations. Furthermore, APP continued to be involved in the development even after the sale to APDC. The district court found that, if APP were the party foreclosing the security interest, APP would be estopped from such foreclosure. This finding is supported by the documents prepared during APP's ownership of the property, including the CC & Rs which were recorded and of notice to the world, and testimony from Gary Frame, a partner in the APP venture, establishing APP's role in the project even after the property was sold to APDC. The *Sun Valley* cases are not on point. In those cases the lender did not undertake any part of the development of the property and there was no possibility that the actions and representations of the lender could create an equitable servitude for the benefit of the owners and associations.

The district court's finding is supported by substantial evidence in the record and will not be overturned on appeal; the owners and associations benefit from equitable servitudes enforceable against the original promisor, APP.

2. **The owners and associations have an equitable interest enforceable against West Wood, the subsequent purchaser of APP's interest.**

 Whether a successor in interest takes the interest subject to the equitable servitude is a question of notice. *Streets,* 898 P.2d at 379–81 (Wyo.1995). Whether a party has notice of an issue or event is a question of fact. *See, e.g., Taylor v. Soran Restaurant, Inc.,* 131 Idaho 525, 960 P.2d 1254 (1998) (Whether notice of injury subject to workers' compensation claim was given to employer was question of fact.)

 The difficulty presented by this inquiry is that the district court did not ground its judgment in the question of notice. The district court stated, "West Wood cannot improve its position over that of APP." This conclusion is in error because the relevant inquiry is not into what right or interest APP had to give.

The *Middlekauff* cases guide this inquiry. In these cases, persons purchased property in a subdivision, with the representation that an adjacent property would be used as a common area for recreational activities. In *Middlekauff I,* the seller had entered bankruptcy and a part of the common area was conveyed to another party. While the property remained common for a while, eventually the new owner prohibited access to the property. Persons who had purchased property in the subdivision sought enforcement of the common area restriction against the successor of their seller. The district court dismissed based on failure to meet the statute of limitation for filing an action. On appeal, this Court remanded after determining that it was possible that the owners of

subdivision property could have acquired an interest in the common area based on the seller's representation, and the time any statute of limitation began running needed to be determined. For guidance on remand, this Court indicated the necessary inquiry was whether the owner acquired an interest enforceable against the original promisor and whether such right should be enforceable against a subsequent purchaser. *Middlekauff I*, 103 Idaho at 834–35, 654 P.2d at 1387–88. On remand, the district court found that the subsequent purchasers were not bona fide purchasers because they had *notice* of the common area use at the time they made their purchase from the bankruptcy court. This Court affirmed that finding. *Middlekauff II*, 110 Idaho at 916, 719 P.2d at 1176.

■ A purchaser is charged with every fact shown by the records and is presumed to know every other fact which an examination suggested by the records would have disclosed. *Kalange v. Rencher*, 136 Idaho 192, 195–96, 30 P.3d 970, 973–74 (2001) (citing *Cordova v. Hood*, 84 U.S. (17 Wall) 1, 21 L.Ed. 587 (1872); *Northwestern Bank v. Freeman*, 171 U.S. 620, 19 S.Ct. 36, 43 L.Ed. 307 (1898)). "This Court has stated: 'One who purchases or encumbrances with notice of inconsistent claims does not take in good faith, and one who fails to investigate the open and obvious inconsistent claim cannot take in good faith.' " *Middlekauff II*, 110 Idaho at 916, 719 P.2d at 1176 (quoting *Langroise v. Becker*, 96 Idaho 218, 220, 526 P.2d 178, 180 (1974)).

The evidence adduced at trial includes a "record of survey" of Lot 5. This document was recorded with Kootenai County on May 10, 1997, and marks the substantial portion of Lot 5 as "common area." West Wood took APP's interest in the property at issue on December 15, 1997. West Wood is charged with notice of this recorded document and that this area was designated as common area. Additionally, Robert Malcolm, representative of West Wood testified at trial that, prior to West Wood acquiring the interest of APP, Malcolm had visited the development, stayed in a condominium, and he and his family had made use of the development's amenities, including the pool facility. Finally, at trial, Malcolm was presented with a declaration he had executed on October 24, 2000. Included with the declaration was a document Malcolm swore was a true and correct copy of the executive committee meeting minutes of Lake County Investments, for a meeting held on May 21, 1997. This meeting would pre-date West Wood's acquisition of APP's interest in the property. With regard to the purchase of APP's interest, the minutes show that Malcolm was informed that the pool facility was part of the condominium phase of the development, and any lodge built on Lot 2 would not have a right to use the facility. Consequently, West Wood had constructive knowledge of the recorded claim that Lot 5 was a common area, and actual knowledge, through Malcolm, that the facilities on Lot 5 were for the use of persons at the condominiums. Therefore, West Wood took the assignment of APP's interest with notice of inconsistent claims, failed to investigate the open and obvious inconsistent claims, and cannot take the property in good faith.

■ The district court granted equitable servitudes based on West Wood being the assignee of APDC, and an assignee can take only what is assigned to it. This Court may affirm the district court on a theory that was not relied upon below. *McCuskey v. Canyon County*, 123 Idaho 657, 663, 851 P.2d 953, 959 (1993) (citing *Andre v. Morrow*, 106 Idaho 455, 459, 680 P.2d 1355, 1359 (1984)). Pursuant to the *Middlekauff I* test, equitable servitudes were created between the owners and associations and the original promisor, APDC, and West Wood came to the property with notice of the servitudes. Therefore, equity allows enforcement of the original promises against West Wood.

## C. The District Court Did Not Err When It Refused To Grant Fee Title Ownership Of Lots 5 And 10 And The Remaining Common Areas To The Arrow Point Community Association, Inc.

■ The owners and associations argue they should be awarded fee simple ownership of the entirety of Lot 5, and Lot 10, through several theories. The first is com-

mon law dedication. The determination of a common law dedication is a question of law. *See Ponderosa Home Site Lot Owners v. Garfield Bay Resort, Inc.,* 139 Idaho 699, 85 P.3d 675 (2004).

"Idaho recognizes common law dedication of land both for public, as well as for private use." *Sun Valley Land And Minerals, Inc. v. Hawkes,* 138 Idaho 543, 548, 66 P.3d 798, 803 (2003). Public dedications are accomplished either statutorily or by the common law. *Worley Highway Dist. v. Yacht Club of Coeur d'Alene,* 116 Idaho 219, 222, 775 P.2d 111, 114 (1989). Common law dedications to the public must satisfy a two-part test. *See Sun Valley Land And Minerals, Inc.,* 66 P.3d at 803. "The elements of a common law dedication are (1) an offer by the owner clearly and unequivocally indicating an intent to dedicate the land and (2) an acceptance of the offer." *Id; Pullin v. Victor,* 103 Idaho 879, 881, 655 P.2d 86, 88 (Ct.App.1982).

"The offer to dedicate may be made in a number of ways, including the act of recording or filing a subdivision plat depicting the specific areas subject to dedication, so long as there is a clear and unequivocal indication the owner intends to dedicate." *See Sun Valley Land And Minerals, Inc.,* 66 P.3d at 803. In determining the intent to dedicate, "the court must examine the plat, as well as 'the surrounding circumstances and conditions of the development and sale of lots.' " *Id.* (citing *Dunham v. Hackney Airpark, Inc.,* 133 Idaho 613, 616, 990 P.2d 1224, 1226 (Ct.App.1999)).

*Ponderosa,* 139 Idaho at 701, 85 P.3d at 677

▉ recorded CC & Rs prior to the sale to APP. It is important to note that no plat had been recorded at that time. Examination of the CC & Rs reveals that they only contemplated common area within the project. Dedication requires more than a general referral to potential common area in order to meet the requirement of a clear and unequivocal intent to dedicate land for a certain use. Because APP did not record a plat and the CC & Rs lack the specificity to constitute a clear and unequivocal offer, no offer of dedication was made by APP to either APDC or the owners or associations.

With regard to any offer of dedication made by APDC to the owners and associations, there are additional problems. Foremost, APDC recorded a plat—several plats, in fact. Only the last plat, recorded May 10, 1997, mentions any common area. However, for the owners and associations to rely on a plat that has been recorded, they must also be charged with notice of the recorded security interest. The existence of that recorded security interest precludes any offer from APP or APDC from being clear and unequivocal. The plat establishes contrary intents, not clear and unequivocal intent to make an offer of dedication. The surrounding circumstances of the transaction reveal nothing more on APP's part than an ambiguous in-▉

▉ The owners and associations also rely on the Condominium Property Act (CPA), I.C. §§ 55–1501 to—1527, arguing that the owners and associations succeeded to property rights in Lots 5 and 10 when they came into existence, i.e. when the association was incorporated or when someone purchased a condominium and became a member. The Court finds that reliance insufficient also. The CC & Rs recorded by APP do not reference the CPA. Additionally, no plat was recorded, so any development could not have qualified under I.C. § 55–1504, which requires recording of a declaration and a plat. APDC could grant only what it took from APP. While APDC did record a declaration and plat, APDC took the property subject to APP's recorded security interest in the property, and could not bring the project under CPA such that APP's properly recorded security interest would be defeated.

The district court did not err in refusing to grant fee title to the owners and associations.

**D. The District Court Did Not Err When It Rendered A Decision As To The Rights ▉ "Parcel A."**

▉ West Wood argues that the district court erred in rendering a decision regarding an easement on Parcel A. In its Memorandum Decision and Order, the district court agreed with West Wood that the issue of any

easement in Parcel A was not properly tried to the court, and resolution of the nature and scope of any easement was premature. However, in its Judgment and Decree of foreclosure, the district court granted foreclosure of Parcel A subject to "existing easements for utilities." This was merely a judicial recognition of the existing easements of record that are senior to the security interest, which West Wood obviously cannot extinguish by its foreclosure. Interference with the recorded, superior easements is what the district court concluded was a premature issue. The district court did not rule in any manner that infringed West Wood's rights over Parcel A, and the determination is affirmed.

### E. The District Court Did Not Abuse Its Discretion In Awarding Costs To The Respondents As The Prevailing Parties.

■ As the prevailing party, the owners and associations sought attorney fees and costs against West Wood, as a matter of right under I.R.C.P. 54(d)(1). The owners and associations sought a recovery of $203,841.60. The district court awarded the owners and associations $6,111.34.

■ The "[d]etermination of who is a prevailing party is committed to the sound discretion of the trial court and will not be disturbed absent abuse of discretion." *Bolger v. Lance*, 137 Idaho 792, 797, 53 P.3d 1211, 1216 (2002) (quoting *Bouten Constr. Co. v. H.F. Magnuson Co.*, 133 Idaho 756, 767, 992 P.2d 751, 762 (1999)). In determining who is a prevailing party, the court must consider, among other things, the extent to which each party prevailed relative to the "final judgment or result." I.R.C.P. 54(d)(1)(B).

West Wood filed a foreclosure against several parcels of property and prevailed with regard to several of those parcels. West Wood was granted foreclosure against the other parcels subject to certain equitable interests. The owners and associations counterclaimed, asserting legal and equitable interests in some of the parcels. The owners and associations did not succeed on their legal claim, but did prevail on their equitable claim. Therefore, while West Wood was successful on the foreclosure action for several of the parcels, West Wood lost to the owners and associations, who were successful on their equitable claim. In view of the extent of which the owners and associations prevailed, we conclude that the district court did not abuse its discretion in awarding $6,111.34 in costs and denying an award of attorney fees.

### F. Neither Side Shall Recover Costs Or Attorney Fees On Appeal.

Both parties assert that they are the prevailing party and entitled to costs under I.A.R. 40. An award of costs requires a determination of who is the "prevailing party." I.A.R. 40. This determination should be left to the discretion of this Court. *See* I.R.C.P. 54(d)(1)(B).

■ Both parties assert that the appeal was taken frivolously. Idaho Code § 12–121 allows for an award of attorney fees only if an appeal is brought, pursued, or defended frivolously, unreasonably or without foundation. *Black v. Ameritel Inns, Inc.*, 139 Idaho 511, 515, 81 P.3d 416, 420 (2003) (citation omitted). The factual posture of this case is complex and no Idaho case law is clearly on point, given the intertwined role of APP as both prior owner-developer and mortgagee of the property. We conclude that neither appeal was brought frivolously.

### IV.

### CONCLUSION

Based on the foregoing analysis, we affirm the district court's Judgment and Decree of Foreclosure. No costs or attorney fees are awarded.

Chief Justice SCHROEDER and Justices BURDICK and WALTERS, Pro Tem., concur.

Justice EISMANN, Dissenting.

Because the majority opinion distorts real property law by holding that the lender on a real estate development can lose its security interest if it knows too much about the pro-

posed development, I respectfully dissent. The majority opinion, if it is ever followed in subsequent cases, will turn real estate financing on its head, to the ultimate detriment of consumers.

The facts relevant to the central issue involved in this case are quite simple. In the 1980's, Arrow Point Properties (APP) began to develop the property at issue as a townhouse condominium project, but that development did not progress very far. A diagram prepared by APP showed that it intended to have a community club on the property later designated as Lot 5. On December 11, 1991, it recorded a set of covenants, conditions, and restrictions (CC & R's) for the property, which defined "common area" to mean "all real property (including improvements thereon) owned by the Association for the common use and enjoyment of the Owners." The CC & R's did not designate where the proposed common area would be. While APP owned the property, there was no Association, there were no Owners, and therefore there was no common area. APP's master plan provided that the final determination of the need and desirability for the service area and community club reservation would be made when the property was platted, and APP never platted the property before selling it.

In 1992 and 1993, Arrow Point Development Company (APDC) purchased the property with APP taking a promissory note secured by a deed of trust. The deed of trust and an addendum to it were both recorded on May 11, 1993. The addendum included a provision stating that if the deed of trust is foreclosed, all improvements on property that had not been released from the deed of trust "shall become the property of the Beneficiary."

After purchasing the property, APDC changed the nature of the development from townhouse condominiums to high-rise condominiums and it divided the property into lots. In 1993 it obtained approval from Kootenai County for a revised planned unit development, and on November 19, 1993, it recorded a plat of the property. The plat did not designate any common areas. On March 11, 1994, it recorded a master set of CC & R's that expressly superseded the prior CC & R's that had been recorded by APP.

After purchasing the property, APDC constructed a pool on Lot 5 and five condominium buildings, and in November 1994 it began selling condominium units. In 1996 and 1997, APDC began experiencing financial difficulties. In 1997, West Wood Investments, Inc., (West Wood) took an assignment of APP's interest in the promissory note and deed of trust. When it foreclosed its deed of trust, the district court ruled that its lien was subordinate to the exclusive rights of the condominium owners to use Lot 5 and the improvements constructed thereon for recreational purposes.

The district court held that West Wood only took whatever interest APP had, and that APP's lien was subordinate to the interests of the condominium owners in Lot 5. The district court reached the latter conclusion as follows:

In essence, APP permitted APDC to market Lot 5 and the pool building as a common area to unsuspecting consumers for APP's own benefit. Frame himself indicated that APP approved the building of the pool building, and also that the construction and use by the homeowners of the pool building on Lot 5 was consistent with the APP development plan utilizing Lot 5 as a common area to benefit the condominium project. APP approved APDC's construction of the pool building, presumably to assist APDC in sales of units and in hopes APP would get its note paid in full.... APP had to know, or certainly should have known, that APDC was marketing the units using Lot 5 and the pool building as an inducement to buyers, and that APDC was in no way advising unsuspecting consumers that APP would take Lot 5 and the pool building away should APDC fail to pay the APP note. In short, APP allowed Lot 5 and the pool building to be sold to unsuspecting consumers as common area.

In summary, the district court held that APP's properly recorded prior lien would be subordinate to the interests of the condominium owners because APP knew or should have known that APDC marketed the condo-

minium units using Lot 5 as a common area and the pool building as inducements to the buyers.

Incredibly, the majority upholds this finding of the district court, after first adding two additional findings of fact of its own. First, it states, "APP engaged in representations of its own, prior to divesting itself of ownership of the property, that the development would include common areas." These "representations" consisted of preparing a diagram that showed a community club and tennis courts on the proposed development and recording CC & R's that indicated there would be common areas, but did not specify where they would be. *What the majority fails to mention is that these representations were not made to any of the condominium owners in this case. There is not a single alleged act by APP that could reasonably be construed as a representation to the condominium owners either that it would not enforce its lien in Lot 5 or that Lot 5 was not subject to its lien.* The diagram prepared by APP did not reflect the development ultimately constructed by APDC and was not used to market the condominiums, and the CC & R's recorded by APP were superseded by those recorded by APDC in March 1994, eight months before it began selling condominiums. The majority's second finding of fact is that APP "was engaged in the development after selling the property to APDC." APP's conduct supporting this finding was the exercise of its rights under its agreement with APDC to approve the construction of the pool and to monitor the project to make sure it was being constructed as planned in order to protect APP's security interest. APP did not engage in any of the construction, nor did it participate in marketing any of the condominiums.

The conduct of APP in this case was no different from that of any other responsible real estate lender. It knew the details of the proposed development, including proposed common areas, and it monitored the development to ensure that it was being constructed according to the borrower's plans. It would also benefit if the development succeeded because it would be paid the sums owing to it. As counsel for the condominium owners admitted during oral argument, in the real world any lender would want to know the details of the proposed development before agreeing to lend money and would monitor the construction to ensure that the development was proceeding according to plan. With the majority's decision in this case, however, any lender that does so in the future risks losing its security interest.

This case in indistinguishable from *Sun Valley Hot Springs Ranch, Inc. v. Kelsey,* 131 Idaho 657, 962 P.2d 1041 (1998) (*Sun Valley I* ). In that case, First Federal Savings and Loan (First Federal) had loaned $400,000 to a real estate developer and had received a mortgage as security. After the developer defaulted on the loan, First Federal obtained title to the development, excluding the lots already sold, through foreclosure proceedings and then assigned its interest to others. The owner of a subdivision lot then brought an action against the assignees contending that it was entitled to an interest in the common areas. In rejecting that argument, this Court stated:

> The fact that First Federal had notice of the plat and the CC & Rs at the time it executed the release does not eliminate its status as a good faith purchaser or disturb the priority of its security interest.... First Federal's knowledge that Clarendon [the developer] intended to create common area and access rights which would attach to the subdivision lots was not a legally recognizable interest that would constitute an adverse claim on the property.

131 Idaho at 661, 962 P.2d at 1045.

The majority attempts to distinguish the *Sun Valley I* case by stating, "In *Sun Valley,* the lender was a stranger to the property prior to lending money to fund the development and taking back a mortgage. APP is not similarly situated." Such distinction is no different than saying, "In *Sun Valley,* the secured party's name was 'First Federal' and in this case it is 'Arrow Properties Partnership.'" A fact that distinguishes a prior opinion must be one that logically would make a difference in the law to be applied. The majority cites no statutory or common law authority holding that a real estate vendor's properly recorded security interest is

inferior to that of a real estate lender, nor does it explain how in this case the applicable law should vary depending upon whether the owner of the security interest is a vendor or a lender. The asserted distinction cannot be based upon an assumption that a vendor knows more about the proposed development on the land sold than would a lender. You would have to be extremely naïve to believe that in *Sun Valley I* First Federal had blindly loaned $400,000 to Clarendon with no knowledge of the details of the proposed development.

The district court in this case held that West Wood stood in the same position as APP. The majority holds that the district court erred in this regard because "the relevant inquiry is not into what right or interest APP had to give." Rather, the relevant inquiry is what notice West Wood had when it acquired APP's interest in the promissory note and deed of trust. The majority finds that West Wood did not take its interest in good faith because the majority concludes that "West Wood took the assignment of APP's interest with notice of inconsistent claims, failed to investigate the open and obvious inconsistent claims, and cannot take the property in good faith." The majority cites three facts supporting its conclusion.

First, the majority refers to the record of survey recorded prior to APP's assignment to West Wood. According to the majority, "This document was recorded with Kootenai County on May 10, 1997, and marks the substantial portion of Lot 5 as 'common area.' . . . West Wood is charged with notice of this recorded document and that this area was designated as common area." This statement by the majority reflects a misunderstanding of real estate law.

"Constructive notice imparted from the record . . . is a matter of statute." *Kalange v. Rencher,* 136 Idaho 192, 195, 30 P.3d 970, 973 (2001). The crux of Idaho's constructive notice recording laws are Idaho Code §§ 55–809 and 55–811. *Miller v. Simonson,* 140 Idaho 287, 92 P.3d 537 (2004). Section 55–809 defines when an instrument is deemed recorded. That is not an issue in the present case. Section 55–811 provides: "Every conveyance of real property acknowledged or

proved, and certified, and recorded as prescribed by law, from the time it is filed with the recorder for record, is constructive notice of the contents thereof to subsequent purchasers and mortgag(e)es." In order to give constructive notice, the document recorded must be a "conveyance of real property." Idaho Code § 55–813 defines a "conveyance" as "every instrument in writing by which any estate or interest in real property is created, alienated, mortgaged or encumbered, or by which the title to any real property may be affected, except wills." A record of a survey is not a conveyance as defined by § 55–813, and therefore it cannot provide constructive notice.

There is a second reason why the record of survey does not give constructive notice under the existing recording statutes. The record of survey was recorded pursuant to Idaho Code §§ 55–1901 *et seq.,* which requires surveyors to record certain surveys. Such recorded surveys do not provide constructive notice to subsequent purchasers because they are outside the chain of title. As this Court explained almost 100 years ago, where Idaho recording statutes provide for grantor-grantee indexes rather than tract indexes, documents that are outside the chain of title—that are executed by someone who does not have a interest of record in the real property—do not provide constructive notice.

> Where, therefore, a stranger to the record title executes an instrument purporting to convey or incumber real estate and causes the same to be recorded, there is no method provided by the statute of this state whereby a person about to deal with such property would be able to find the record of such conveyance or incumbrance executed by such stranger; nor do the recording laws require the recorder to make any such index, notation, or record as would enable either him or any one else to find such record if he were making an abstract of the title to such property. In view of this condition of this statute, it would seem that the conveyance mentioned in section 3159 [currently I.C. § 55–811], which constitutes constructive notice to subsequent purchasers and mortgagees, must be intended as a conveyance emanating direct-

ly, or through mesne conveyances, from the holder of the record title. The Legislature certainly did not mean to enact an absurdity or provide for a constructive notice that would never be likely to give any actual notice to one who might in fact search the records.

*Harris v. Reed*, 21 Idaho 364, 371–72, 121 P. 780, 782 (1912). Because the recorded survey was outside the chain of title, it did not provide constructive notice, at least under the law in existence prior to the majority opinion herein.

The two other facts cited by the majority in support of its finding are that prior to its assignment from APP, a West Wood representative stayed in a condominium and used the pool and he also attended a meeting at which a participant stated that "the swimming pool facility is a part of the condominium phase of the project and could not be owned by the lodge [that may be built on another lot]." The majority's conclusion that this represents "notice of inconsistent claims" reflects a confusion regarding the distinction between an owner of real property and the holder of a security interest in it. APDC was the owner of the common area. APP only had a security interest in the common area. APP had no right to the possession of the common area, nor did it have any right to exclude people from the common area. The condominium owners were using the common area with the permission of the owner, APDC. Their use was not inconsistent with APP's rights as beneficiary of the deed of trust, nor would their use give notice of any claim that APP's security interest was unenforceable.

The majority's reference to *Middlekauff v. Lake Cascade, Inc.*, 110 Idaho 909, 719 P.2d 1169 (1986), and *Middlekauff v. Lake Cascade, Inc.*, 103 Idaho 832, 654 P.2d 1385 (1982), reflects its failure to distinguish between the owner of real property and the holder of a security interest in that real property. In *Middlekauff*, the owner-developer of a subdivision represented to purchasers of lots in that subdivision that adjoining real property owned by the developer would remain common area for use by the purchasers. *Middlekauff* had nothing to do with the

rights of the holder of a security interest in the real property. As this Court explained in *Sun Valley Land and Minerals, Inc. v. Hawkes*, 138 Idaho 543, 549, 66 P.3d 798, 804 (2003) (*Sun Valley II*) (citation omitted):

This Court has held that, under certain circumstances, misrepresentations of a developer alone may be sufficient evidence to establish a legally enforceable interest. Nevertheless, while *Middlekauff* stands for the idea that misrepresentation alone may be sufficient evidence, the right to relief must be based on an independent cause of action, such as misrepresentation or fraud. Further, in order to prove a representation in fact occurred, the court must make a factual inquiry into the circumstances surrounding the interaction between buyer and seller.

The Lot Owners' argument fails, because they do not provide a legal basis for their claim. Moreover, this Court already determined the Lot Owners were in fact informed of the risks involved in this development prior to purchasing the lots.

In *Sun Valley II*, we held that representations by the developer that portions of the development would be common area did not give the lot owners, who purchased in reliance on those representations, a legal claim in the common area superior to that of the lender who had a security interest in that common area. Now, less than two years later, the majority effectively overrules *Sun Valley II*.

The majority quotes from *Kalange v. Rencher*, 136 Idaho 192, 195–96, 30 P.3d 970, 973–74 (2001), as follows: "A purchaser is charged with every fact shown by the records and is presumed to know every other fact which an examination suggested by the records would have disclosed." It is undisputed that the duly recorded deed of trust in which APP was beneficiary, and the accompanying duly recorded addendum, expressly stated that if APP was not paid, all improvements on property that had not been released from the deed of trust, which would include the common area (Lot 5), "shall become the property of the Beneficiary." When the deed of trust was foreclosed, West Wood was the beneficiary and was legally

entitled to the property subject to the deed of trust free of any subsequently acquired interests. Although the majority gives lip service to the law quoted from *Kalange v. Rencher,* it fails to explain why that law does not apply to the condominium owners in this case. Apparently, courts can selectively apply the constructive notice provided by our recording statutes.