# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 51455

VINTAGE II, LLC, a Wyoming limited liability company,

    Plaintiff-Appellant,

and

CHRISTINE HOLDING, an individual,

    Plaintiff,

v.

TETON SADDLEBACK VISTAS HOMEOWNERS ASSOCIATION, INC., an Idaho non-profit corporation,

    Defendant-Respondent

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Boise, June 2025 Term**

**Opinion filed: September 10, 2025**

**Melanie Gagnepain, Clerk**

---

Appeal from the District Court of the Seventh Judicial District of the State of Idaho, Teton County. Alan C. Stephens, Senior District Judge.

The district court's order on reconsideration is <u>affirmed in part</u> and <u>reversed in part</u>, the amended judgment entered in this matter is <u>vacated</u>, and the case is <u>remanded</u> for entry of judgment in favor of Appellant.

Givens Pursley LLP, Boise, for Appellant. Thomas E. Dvorak argued.

Holden, Kidwell, Hahn & Crapo, Idaho Falls, for Respondent. D. Andrew Rawlings argued.

---

MOELLER, Justice.

This appeal stems from a quiet title action brought to determine whether certain lands were subject to the covenants and restrictions placed on an adjacent subdivision. Vintage II, LLC, a Wyoming Limited Liability Company ("Vintage"), and Christine Holding ("Holding")

1

(collectively "Plaintiffs"),[1] own real property in Teton County, Idaho, which lies either within or adjacent to the Teton Saddleback Vistas Subdivision. In 2021, Vintage and Holding filed a complaint to quiet title against the Teton Saddleback Vistas Homeowners Association, Inc. ("Teton Saddleback"). They sought a declaration that their properties were unencumbered by three recorded instruments, all different versions of the covenants, conditions, and restrictions ("CC&Rs") applicable to the Teton Saddleback Vistas Subdivision.

Following a bench trial, the district court denied the Plaintiffs' quiet title action. The court concluded that the CC&Rs did not encumber the properties in question; however, the Master Plan for the subdivision—which was referenced in the Plaintiffs' respective deeds—did encumber the property because it assigned lot numbers, designated lot sizes, and set forth open area requirements. Vintage appeals this decision. For the reasons set forth below, we affirm in part, reverse in part, and remand for further proceedings.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Vintage and Holding both own real property in Teton County, Idaho. Vintage owns a 359.48-acre parcel and a 40-acre parcel. It took title to its parcels in October 2014 pursuant to a warranty deed. Holding owns a 241.26-acre parcel, which she took title to in July 2021 pursuant to a warranty deed from Vintage. These properties will be referred to collectively as the "Subject Property." Teton Saddleback is an Idaho nonprofit corporation claiming a "right, title, or interest in" the Subject Property.

### A. Complaint to Quiet Title

In September 2021, Plaintiffs filed a verified complaint seeking to quiet title to their properties against Teton Saddleback pursuant to Idaho Code section 6-401. Their complaint sought a judicial determination that their properties were not encumbered by several different, recorded versions of Teton Saddleback's CC&Rs:

- The First Declaration of Covenants, Conditions, Restrictions and Maintenance and Architectural Control (the "First Declaration"), Instrument Number 173855, recorded January 4, 2006;

[1] The Notice of Appeal reflects that only Vintage is appealing, even though Holding was also a plaintiff in the underlying action. Therefore, when referring to Vintage and Holding collectively, they will be referred to as "Plaintiffs" rather than "Appellants."

- The First Restated Declaration of Covenants, Conditions, Restrictions and Maintenance and Architectural Control (the "First Restated Declaration"), Instrument Number 174673, recorded February 8, 2006; and

- The First Amendment to First Declaration of Covenants, Conditions, Restrictions and Maintenance and Architectural Control (the "First Amendment"), Instrument Number 239244, recorded December 15, 2015.

While the Complaint only referenced these three instruments, Plaintiffs asked for broader relief. Specifically, the prayer for relief asked the court to "declare that [Teton Saddleback] has no interest in the Subject Property." In its Amended Answer, Teton Saddleback raised several affirmative defenses, including the existence of equitable servitudes affecting the Subject Property.

### B. Motion for Summary Judgment, Stipulations of Material Facts and Exhibits, and the Bench Trial.

Vintage and Holding moved for summary judgment, which the district court granted in part and denied in part. The court found that the First Declaration did not encumber the Subject Property because it lacked an "express description of [the] property to be encumbered . . . ." Likewise, the court held that the First Restated Declaration did not encumber the Subject Property because it created an ambiguity as to what property the CC&Rs were intended to encumber. However, the district court found that genuine issues of material fact remained regarding whether the 2015 instrument, the First Amendment, was enforceable against the Plaintiffs. After the district court entered its order denying summary judgment, both parties filed motions for reconsideration. The district court denied both motions.[2]

The case proceeded to a bench trial.[3] Prior to trial, the parties entered a Stipulation of Material Facts and Exhibits ("the Stipulation"). This included an agreement to admit the following exhibits: the three CC&R instruments enumerated in the Complaint, the Phase I Plat, the Amended Phase I Plat, the Phase II Plat, and both Vintage and Holding's Warranty Deeds. The Stipulation also stated the parties' agreement that "Plaintiffs' property is not part of either the Phase I Plat or the Phase II Plat." The Teton Saddleback Vistas Subdivision Master Plan, recorded on January 4,

---

[2] The Honorable Stephen Boyce, District Judge, presided over the pre-trial stages of this case through January 2023 and ruled on all the pre-trial motions.

[3] The Honorable Alan C. Stephens, Senior District Judge, was assigned to handle the bench trial of this matter, which commenced on May 18, 2023. Judge Stephens ruled on all the post-trial motions and issued the final judgment.

2006, as Instrument No. 173851, was not included in the Stipulation even though both Vintage and Holding's Warranty Deeds expressly reference the Master Plan.

On the day of trial, Vintage and Holding brought a motion in limine to exclude the Master Plan from being admitted into evidence. They argued that the Master Plan was not relevant and, even if it were, it was inadmissible because Teton Saddleback lacked a witness who could lay the necessary foundation for it. Additionally, the last two pages of the Master Plan contained a watermark stating that it was "Not a legal copy." The district court granted the motion in part, excluding the final two pages of the Master Plan due to the watermark, but allowing the remainder of the document to come in as "evidence of a Master Plan that was recorded by Teton County."

The Master Plan includes a graphic depiction of the entire Teton Saddleback Vistas Subdivision and "Area/Units/Density" tables for each phase. It also includes an Owner's Certificate that states:

> Be it known that we, the undersigned owners of the subdivision of land as herein platted and described, certify that it is with the free consent and in accordance with the desires of said owners and proprietors of said described lands:
>
> That the name of the subdivision will be Teton Saddleback Vistas;
>
> That access to said subdivision will be from State Highway 33 and County Road 400 South;
>
> That the subdivision is subject to the Declaration of Covenants and Restrictions of record;
>
> That the subdivision is subject to any rights-of-way or easements of sight or record and as dedicated by this plat;
>
> That all roads are hereby dedicated to the public;
>
> That the dedicated utility easements are for the use of sewer, water, electric, telephone, and cable TV utilities;
>
> That the owner/developer will maintain all landscaping according to the final landscaping plan submitted to the Teton County Planning & Zoning Commission until the Homeowners' Association assumes responsibility for said landscaping maintenance;
>
> That the subdivision is subject to the right to farm act state[d] in Idaho Code section 22-4500 and does recognize the neighboring land under this law.

(Capitalization modified.)

At trial, only one witness testified: Steve Wuthrich, President of Teton Saddleback. Wuthrich averred that when he purchased his property in the Teton Saddleback Vistas Subdivision in 2009, he received a copy of the CC&Rs and the Master Plan from his title company, since the

4

project was still under development. Wuthrich further testified that the Master Plan was never fully carried out. In fact, there had not been any development of the Teton Saddleback Vistas Subdivision since 2009 and, in 2014, the developer decided to "give up" on the development and sell the remaining portions of the Teton Saddleback Vistas Subdivision at auction. This is how Vintage came to purchase its property from the developer. Finally, Wuthrich testified that Vintage's manager approached him in 2021 requesting assistance because Vintage had attempted to sell the Subject Property, but when it tried to do so, "the CC&Rs emerged as being connected to the land."

Turning back to the trial, the district court admitted the Master Plan into evidence over Vintage's relevance objection, stating: "I think there is some relevance to it. I'm not sure exactly what, at this point, but I'll admit it."

### C. Findings of Fact and Conclusions of Law

Following the bench trial, the district court entered its Findings of Fact and Conclusions of Law. The court explained that, while there were not any validly recorded and enforceable CC&Rs at the time Vintage acquired its parcels in 2014, the question considered at trial was whether Vintage and Holding nevertheless had notice that they were purchasing land with certain restrictions. The district court answered this question in the affirmative.

The district court first looked to the Master Plan and the Plaintiffs' Warranty Deeds. Vintage's deed stated that it would take "ALL THAT PORTION . . . CONTAINED WITHIN THE OUTSIDE BOUNDARIES OF THE '*MASTER PLAN*' OF TETON SADDLEBACK VISTAS SUBDIVISION RECORDED AS INSTRUMENT 173851, RECORDS, TETON COUNTY, IDAHO." (Capitalization in original; emphasis added). Based on this language in Vintage's deed, the district court found:

> [T]he warranty deed itself belies the argument that Vintage II had no notice of any potential encumbrance against the land because Vintage II took title expressly tied to land described in the Master Plan for Teton Saddleback Vistas.

Thus, the district court concluded that Vintage[4] had actual notice of possible encumbrances when it took title to the land in 2014.

---

[4] The district court's Findings of Fact and Conclusions of Law did not address whether Holding had notice of the Master Plan because it concluded that her parcel was subject to the First Amendment to the CC&Rs recorded in 2015. On reconsideration, the district court changed course and concluded that Holding was exempt from the First Amendment to the CC&Rs under the Shelter Rule since she had purchased her property from Vintage. *See Nampa*

The district court next addressed Teton Saddleback's affirmative defense, which asserted that the properties were subject to certain equitable servitudes. The court found that (1) "the Master Plan is in the record and facially establishes clear intentions for the use of the land by which purchasers of lots could reasonably rely as enforceable," and (2) "the dedications and approved use reduced to [writing in] the 2004 Master Plan for Teton Saddleback Vistas runs with the land therein described." It further noted that "[t]he Master Plan contains a dedication from the original developer about the intended use of land in the subdivision." The district court concluded that "[d]espite the CC&Rs [sic] deficiencies, the Master Plan itself contemplates open areas, equestrian trails, establishes that the land being subdivided as Teton Saddleback Vistas would comprise 141 building lots with specified average lot size." Because Vintage had notice of the Master Plan when it purchased the land, and the Master Plan contained a dedication, the district court further concluded that the Master Plan binds the land. Therefore, the court reasoned that neither Vintage nor Holding could "prevail in obtaining an order stating the [S]ubject [P]roperty is free of any encumbrance."

Accordingly, the district court declined to quiet title and ruled that the Subject Property owned by Vintage and Holding was subject to the Master Plan.

### D. Plaintiffs' Motion for Reconsideration, New Trial, or Relief from Judgment and the Amended Judgment

After the district court entered its Findings of Fact and Conclusions of Law, the Plaintiffs filed a Motion for Reconsideration, New Trial, or Relief from Judgment. They argued that the Master Plan was not properly before the court during the bench trial since it was not mentioned in the pleadings and they had not expressly or impliedly consented to the court addressing the issue during or after the trial. Vintage asked the court to "open the June 30, 2023, Judgment, take additional testimony, and amend the findings of fact and conclusions of law as appropriate."

After a hearing, the district court entered an order granting the Plaintiffs' motion in part and denying it in part. The district court reasoned that since Vintage and Holding had asked the court to determine that "[Teton Saddleback] has no interest in the Subject Property," the court had to "evaluate the legal effect of *any instrument* admitted in the record touching upon the [S]ubject

*Highway Dist. No. 1 v. Knight*, 166 Idaho 609, 614–15, 462 P.3d 137, 142–43 (2020) ("[T]he 'Shelter Rule' . . . protects a purchaser with notice if their predecessor in interest was an innocent purchaser."). However, the court went on to conclude that the analysis regarding the effect of the Master Plan on Vintage's parcel was equally applicable to Holding's parcel because her deed likewise referenced the Master Plan.

6

[P]roperty." (Emphasis added). Thus, since the Master Plan was a recorded document mentioned in both deeds, and since it had been admitted at trial, the court concluded that it was necessary to consider the Master Plan to "make [a] legal determination[] about what restrictions—if any—run with the land in order to resolve [the] claim for quiet title that Plaintiffs raised in a [verified complaint]."

The district court went on to explain that whether a master plan could create restrictive covenants was an issue of first impression, so it turned to caselaw from other jurisdictions to decide the issue. Looking to *New Castle County v. Pike Creek Recreational Services, LLC*, 82 A.3d 731 (Del. Ch. 2013), an opinion by the Delaware Court of Chancery, the district court concluded that Teton Saddleback "does have an interest in the subject land to the extent that the use of the land is in conformity with the Master Plan." Regarding the Master Plan, the court explained:

> [T]he document is clear on its face that within the outer boundaries of the legal description of the land being subdivided, certain limitations on number of lots, average lot size, acres dedicated to roads, and acres preserved as open area were intended to bind and run with the land. Plaintiffs' arguments that this dedication to open space is not clear or is ambiguous is unavailing.

The district court denied the Plaintiffs' motion to reconsider its ruling on the Master Plan since it believed they had placed this issue squarely before the court by requesting a decree quieting title. Accordingly, the court once again denied Plaintiffs' request to quiet title and entered an Amended Judgment that ruled as follows:

- The First Declaration is null and void;
- The First Amendment is valid but does not apply to either the Vintage or the Holding parcels because (a) it took effect after Vintage received title and (b) Holding was exempt under the Shelter Rule since she had purchased her property from Vintage; and
- The Vintage and Holding parcels are subject to the dedications and restrictions of the Master Plan delineated in Instrument No. 173851 including, but not limited to, the details of 141 building lots with specified average lot size.

Vintage timely appealed.

## II.     STANDARDS OF REVIEW

"The question of whether evidence is relevant is reviewed de novo, while the decision to admit relevant evidence is reviewed for an abuse of discretion." *Perception Constr. Mgmt., Inc. v. Bell*, 151 Idaho 250, 253, 254 P.3d 1246, 1249 (2011). This Court reviews a district court's

7

conclusions of law de novo. *Rowley v. Ada Cnty. Highway Dist.*, 156 Idaho 275, 277, 322 P.3d 1008, 1011 (2014). This Court's abuse of discretion standard asks "[w]hether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018) (citing *Hull v. Giesler*, 163 Idaho 247, 250, 409 P.3d 827, 830 (2018)).

"This Court applies contract principles to interpret restrictive covenants." *Adams v. Kimberley One Townhouse Owner's Ass'n, Inc.*, 158 Idaho 770, 773, 352 P.3d 492, 495 (2015) (citing *Sky Canyon Props., LLC v. Golf Club at Black Rock, LLC*, 155 Idaho 604, 606, 315 P.3d 792, 794 (2013)). When deciding whether a restrictive covenant is ambiguous, this Court "view[s] the agreement as a whole to determine the intent of the parties at the time of contracting. If a covenant is unambiguous, the [C]ourt must apply its plain meaning as a matter of law." *Id.* (quoting *Best Hill Coal. v. Halko, LLC*, 144 Idaho 813, 817, 172 P.3d 1088, 1092 (2007)). "Whether a contract is ambiguous is a question of law over which the Court exercises free review." *Id.* (quoting *Best Hill Coal.*, 144 Idaho at 817, 172 P.3d at 1092). Importantly, we have consistently held that "[i]n construing a restrictive covenant, which is in derogation of the common law right to use land, restrictions are not to be extended by implication to include any restriction not expressed clearly and doubts are to be resolved in favor of the free use of land." *Post v. Murphy*, 125 Idaho 473, 475, 873 P.2d 118, 120 (1994) (citing *Thomas v. Campbell*, 107 Idaho 398, 404, 690 P.2d 333, 339 (1984)), *overruled on other grounds by Miller v. Rocking Ranch No. 3 Prop. Owners' Ass'n, Inc.*, 173 Idaho 359, 541 P.3d 1279 (2024).

"Whether a common law dedication has occurred is an issue of law." *Kepler-Fleenor v. Fremont County*, 152 Idaho 207, 211, 268 P.3d 1159, 1163 (2012).

### III.    ANALYSIS

On appeal, Vintage assigns three points of error to the district court's decision, each addressing the meaning and effect that should be afforded the Master Plan. First, it argues that this Court should reverse the district court's finding that the Master Plan was relevant and conclusive to their quiet title action. Second, Vintage maintains that the court erred in concluding that the provisions of the Master Plan constituted a valid restrictive covenant. Lastly, Vintage argues that the district court further erred  when it concluded that the Master Plan contained a proper

dedication that encompassed at least part of the Subject Property. We will address each point of error in turn.

### A. The district court did not err in admitting the Master Plan at trial because it was relevant.

Notwithstanding Plaintiffs' motion in limine prior to trial, and their objection at trial, the district court admitted the Master Plan into evidence. On appeal, Vintage asserts that the Complaint sought to quiet title solely with respect to three discrete instruments: the CC&Rs in the First Declaration, the First Restated Declaration, and the First Amendment. Thus, they contend that the Master Plan was irrelevant and the district court should not have considered it. Vintage maintains that the Master Plan was not only irrelevant to their quiet title action, but Teton Saddleback's attempts to introduce it at trial amounted to an unpleaded counterclaim, which the district court erroneously considered at trial. Vintage argues that it was "unfairly surprised" by the court's decision to rely on the Master Plan in denying their request to quiet title and maintains that it should have been allowed an opportunity to re-open the judgment to present testimony in opposition to the Master Plan.

Initially, we note that Vintage's assertion that it was only seeking to quiet title in regards to three specific documents is belied by the prayer for relief in the Complaint, which requested that the district court declare that Teton Saddleback has "no interest in the Subject Property." Thus, Teton Saddleback argues persuasively that the district court did not err in admitting the Master Plan because it was referenced in the Plaintiffs' deeds, making it material to the determination of whether Vintage and Holding were entitled to the relief they sought—i.e., a judgment that Teton Saddleback had "no interest in the Subject Property." Teton Saddleback also argues the Master Plan is relevant because it shows that Plaintiffs had actual notice that their property was subject to certain restrictions when they purchased the parcels.

Below, the district court addressed these arguments in its Memorandum Decision and Order following Vintage's post-trial motion for reconsideration. The district court reasoned that in a quiet title action, it had to "evaluate the legal effect of *any instrument* admitted in the record touching upon the subject property," including the Master Plan. (Emphasis added). Thus, the Master Plan was highly relevant to the question of whether Teton Saddleback had "no interest" in the subject property—the primary objective of the Plaintiffs' complaint. Applying our de novo standard of review to the question of relevancy, we agree with the district court's conclusion that the Master Plan was relevant.

9

To determine the relevancy of the Master Plan in this case, first we must consider the nature of a quiet title action. "In Idaho, quiet-title actions have long been provided for by statute: 'An action may be brought by any person against another who claims an estate or interest in real or personal property adverse to him, for the purpose of determining such adverse claim.' " *Bennett v. Bank of E. Or.*, 167 Idaho 481, 486, 472 P.3d 1125, 1130 (2020) (first quoting I.C. § 6-401; and then citing *Fry v. Summers*, 4 Idaho 424, 425–26, 39 P. 1118, 1118 (1895)). Additionally, "[t]he purpose of a quiet title action is to finally settle and determine, as between the parties, *all* conflicting claims to the property in the controversy, and to decree to each party such interest or estate therein as he or she may be entitled to . . . ." 65 Am. Jur. 2d *Quieting Title* § 1 (2025) (emphasis added) (citing *W. Aggregates, Inc. v. County of Yuba*, 130 Cal. Rptr. 2d 436 (Cal. Dist. Ct. App. 2002)). In an action to quiet title, the "burden is on the plaintiff to establish title, legal or equitable, free of *any* encumbrance." 74 C.J.S. *Quieting Title* § 77 (2024) (emphasis added) (footnotes omitted). "The plaintiff must rely on the strength of his title or interest—not any weaknesses or imperfections in his adversary's." *Bennett*, 167 Idaho at 491, 472 P.3d at 1135 (citing *Rexburg Lumber Co. v. Purrington*, 62 Idaho 461, 468, 113 P.2d 511, 513 (1941)).

Regardless of the type of action, relevance is defined by the Idaho Rules of Evidence. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." I.R.E. 401. "Whether a fact is 'of consequence' or material is determined by its relationship to the legal theories presented by the parties." *State v. Garcia*, 166 Idaho 661, 670, 462 P.3d 1125, 1134 (2020) (citation omitted). Black's Law Dictionary defines "material" as "[h]aving some logical connection with the consequential facts." *Material*, Black's Law Dictionary (12th ed. 2024). Thus, for purposes of this appeal, we must view relevancy through the lens of whether the Master Plan has "some logical connection" to the property that is the subject of this quiet title action.

Here, both Plaintiffs' Warranty Deeds referenced the Master Plan. Because the Master Plan was mentioned in the legal description of the deeds and could have acted as a cloud on title to the property, the district court did not err by finding the Master Plan relevant nor did it abuse its discretion in admitting the Master Plan and considering its applicability to this case. Vintage's Warranty Deed specified that Vintage acquired:

> ALL THAT PORTION OF SECTIONS 13 AND 14, TOWNSHIP 4 NORTH, RANGE 45 EAST AND IN SECTION 18, TOWNSHIP 4 NORTH, RANGE 46 EAST, ALL IN BOISE MERIDIAN, TETON COUNTY, IDAHO AND

CONTAINED WITHIN THE OUTSIDE BOUNDARIES OF THE *"MASTER PLAN"* OF TETON SADDLEBACK VISTAS SUBDIVISION RECORDED AS INSTRUMENT 173851, RECORDS, TETON COUNTY, IDAHO.

EXCEPT THE FOLLOWING:

. . . .

THOSE PLATTED PORTIONS KNOWN AS TETON SADDLEBACK VISTAS PHASE I, AMENDED PLAT FOR TETON SADDLEBACK VISTAS PHASE I AND TETON SADDLEBACK VISTAS PHASE II, RECORDED AS INSTRUMENTS 173852, 187518 (BEING A RE-RECORDING OF 186532) AND 187154, RESPECTIVELY, RECORDS, TETON COUNTY, IDAHO.

(Capitalization in original; emphasis added). Likewise, Holding's deed specifies the land she took, referring to it as:

(ALSO KNOWN AS A PORTION OF TETON SADDLEBACK VISTAS SUBDIVISION, *MASTER PLAN*, TETON COUNTY, IDAHO, AS THE SAME APPEARS ON THE OFFICIAL PLAT THEREOF RECORDED JANUARY 4, 2006 AS INSTRUMENT NO. 173851 AND AMENDED JUNE 6, 2006, AS INSTRUMENT NO. 177562.)

(Emphasis added). We agree that the reference to the Master Plan in both the Vintage and Holding warranty deeds made the Master Plan relevant to the analysis of what, if any, interest Teton Saddleback had in the properties.

Concerning Vintage's notice argument, Wuthrich testified at trial that he had been a homeowner in Teton Saddleback Vistas Subdivision since 2009. Wuthrich also attested that, when he purchased his property, he received several maps depicting the entire development from the title company, including the Master Plan. Despite Plaintiffs raising a relevance objection to this testimony, the court admitted the Master Plan, reasoning that the "document speaks for itself." Just because the Master Plan was not included in the list of stipulated exhibits, that did not render it irrelevant or inadmissible; nor can Plaintiffs reasonably be said to have been "surprised" by a document being presented and admitted at trial that is referenced in their respective deeds.

For these reasons, we conclude that the district court did not abuse its discretion in admitting the Master Plan at trial because (1) it was relevant to the question of what, if any, interest Teton Saddleback had in the Subject Property, and (2) the Plaintiffs should not have been surprised or prejudiced by the admission of a document expressly referenced in their deeds. Therefore, it had "some logical connection [to] the consequential facts" of this action. *See Material*, Black's Law Dictionary (12th ed. 2024).

**B. The district court erred when it concluded the Master Plan created restrictive covenants and equitable servitudes limiting Plaintiffs' use of the Subject Property.**

Having determined that the Master Plan was properly admitted at trial, we next turn to the substance of the Master Plan and whether it contained any restrictive covenants or equitable servitudes that encumber the Subject Property. Vintage contends that because the Master Plan does not clearly express that it binds the Subject Property, it cannot impose any restrictions limiting the Subject Property's use. They maintain the district court erred by concluding that the Master Plan contained express covenants or servitudes that affected the Subject Property. Vintage acknowledges that a master plan "*could* impose valid restrictions," but asserts that the terms of the Master Plan are ambiguous, thereby necessitating that we must construe any covenants narrowly to preserve the free use of the land.

Teton Saddleback counters by noting that, while the Master Plan is neither a declaration of covenants nor a plat, it nevertheless puts "developers, lot owners, and future buyers on notice of what is planned throughout all of the various phases" of the project, thereby imposing certain restrictions relating to the numbers of lots, lot sizes, and open area requirements. Thus, it is Teton Saddleback's position that, although the Master Plan does not contain a comprehensive set of restrictions, it does restrict the development of all the property in the Teton Saddleback Vistas Subdivision, including the Subject Property.

"Equitable servitudes and negative real covenants are two types of restrictive covenants that retain many similarities." *St. Clair v. Krueger*, 115 Idaho 702, 703 n.1, 769 P.2d 579, 580 n.1 (1989). "Equitable servitudes are distinguished from covenants running with the land in that the latter should be of record, and a buyer takes with constructive knowledge, if not actual knowledge, of the existence of such recorded covenants and is thereby bound to the covenants." *W. Wood Invs., Inc. v. Acord*, 141 Idaho 75, 83, 106 P.3d 401, 409 (2005). A restrictive covenant is "[a] private agreement, usu[ally] in a deed or lease, that restricts the use or occupancy of real property, esp[ecially] by specifying lot sizes, building lines, architectural styles, and the uses to which the property may be put." *Restrictive Covenant*, Black's Law Dictionary (12th ed. 2024).

We have previously held that "[r]estrictive covenants, which restrict the uses to which a party may put his or her property, are valid and enforceable." *Eagle Springs Homeowners Ass'n, Inc. v. Rodina*, 165 Idaho 862, 868, 454 P.3d 504, 510 (2019). "However, because restrictions on the free use of property are at odds with the common law right to use land for all lawful purposes," this Court will "not construe them 'to extend by implication any restriction not clearly expressed

in the covenants.' " *Adams v. Kimberley One Townhouse Owner's Ass'n, Inc.*, 158 Idaho 770, 352 P.3d 492 (2015) (quoting *Sky Canyon Props. v. Golf Club at Black Rock, LLC*, 155 Idaho 604, 606, 315 P.3d 792, 794 (2013)); *Rodina*, 165 Idaho at 868, 454 P.3d at 510 (quoting *Brown v. Perkins*, 129 Idaho 189, 192, 923 P.2d 434, 437 (1996)). Thus, restrictions that are ambiguous and not clearly expressed "will be resolved in favor of the free use of land." *Adams*, 158 Idaho at 773, 352 P.3d at 495 (quoting *Jacklin Land Co. v. Blue Dog RV, Inc.*, 151 Idaho 242, 246, 254 P.3d 1238, 1242).

As noted above, when interpreting restrictive covenants, "this Court generally applies the same rules of construction as it does for any other contract":

> Where contract terms are clear and unambiguous, the interpretation of the contract's meaning is a question of law. On the other hand, where the terms of a contract are ambiguous, the interpretation of the contract's meaning is a question of fact. The preliminary question of whether a contract is ambiguous is a question of law over which this Court exercises free review . . . . To determine whether there is an ambiguity in the Restrictive Covenants . . . [this] Court must determine whether the provisions are reasonably susceptible to conflicting interpretations. In interpreting any provisions of a contract or restrictive covenant, the entire agreement must be viewed as a whole.

*Rodina*, 165 Idaho at 868, 454 P.3d at 510 (alterations in original) (quoting *Brown*, 129 Idaho at 192-93, 923 P.2d at 437-38). If there is an ambiguity, courts must look to "the language of the covenants, the existing circumstances at the time of the formulation of the covenants, and the conduct of the parties" to deduce the intent of the parties at the time the instrument was drafted. *Pinehaven Planning Bd. v. Brooks*, 138 Idaho 826, 829, 70 P.3d 664, 667 (2003) (quoting *Brown*, 129 Idaho at 193, 923 P.2d at 438). Nevertheless, we again emphasize that the interpretation of an ambiguous covenant is always constrained by the overriding principle that "because restrictive covenants are in derogation of the common law right to use land for all lawful purposes, the Court will not extend by implication any restriction not clearly expressed." *Id.*, (citing *Post v. Murphy*, 125 Idaho 473, 475, 873 P.2d 118, 120 (1994) *overruled on other grounds by Miller v. Rocking Ranch No. 3 Prop. Owners' Ass'n, Inc.*, 173 Idaho 359, 541 P.l3d 1279 (2024)).

Below, the district court concluded that the Master Plan encumbered the Subject Property. In reaching this conclusion, the district court acknowledged that it could find no Idaho caselaw on point, so it turned to persuasive authority from the Delaware Chancery Court's decision in *New Castle County v. Pike Creek Recreational Services, LLC*, 82 A.3d 731 (Del. Ch. 2013). In *New Castle*, the county asked the court to find that two agreements, collectively referred to as the

"master plan," prevented Pine Creek Recreational Services ("PCRS") from developing land that once operated as a golf course. *Id.* at 735. Looking at the language of the master plan, the Delaware Chancery Court found it plainly and unambiguously evidenced the original owner's intent that certain restrictions run with the land, including an open space requirement. *Id.* at 747. The court pointed to language in the master plan stating: "The DEVELOPER does hereby, for itself, its successors, transferees, and assigns, *impose the restrictions*, limitations and covenants, with respect to use and occupancy hereinafter set forth in detail upon . . . the SUBJECT ACREAGE" as indicative of the intent to institute a series of restrictive covenants that would run with the land. *Id.* (capitalization and alteration in original; emphasis added). Included among these enumerated restrictions was an open space requirement, the Master Plan specifically stating that "DEVELOPER, its successors and assigns, will set aside and hold throughout the course of development of the entire SUBJECT ACREAGE the following land uses irrespective of the ultimate zoning of the SUBJECT ACREAGE: . . . Open Spaces, 158.0 acres minimum." *Id.* (capitalization and alteration in original). Based on this definitive language, the Delaware court believed there could be "no mistaking the intent of the original owners to institute a series of restrictive covenants that would run with the land," including a clear intent to dedicate certain acreage as open space. *Id.* Since the master plan clearly intended to maintain certain areas as open spaces, the Chancery Court found that PCRS could not develop on the acres it sought to without violating this open space provision. *Id.* at 748-49.

Applying *New Castle* to the present case, the district court stated the following with respect to the Master Plan:

> [T]he document is clear on its face that within the outer boundaries of the legal description of the land being subdivided, certain limitations on number of lots, average lot size, acres dedicated to roads, and acres preserved as open area were intended to bind and run with the land.

Thus, the district court found that the Master Plan clearly intended certain restrictions to run with the land. Accordingly, it denied Plaintiffs' request to quiet title.

Because the circumstances of this case are significantly different from those in *New Castle*, we conclude that the district court erred in applying its holding to the facts present here. While the reasoning in *New Castle* is compelling, its facts are clearly distinguishable from the present case. Unlike in *New Castle*, this Court does not have the benefit of the entirety of the Master Plan. Indeed, the district court did not admit the last two pages of the Master Plan here because it

14

contained a watermark stating it was "Not a legal copy." Thus, this Court's review is limited to whether the Master Plan's graphic depiction (survey) of the area, the "Area/Units/Density Table's," and the Owner's Certificate indicate a clear intent to impose restrictions on the land. Reviewing these portions of the Master Plan, we conclude that they are insufficiently clear to impose any restrictions on the Subject Property. Absent a clear expression of the precise covenants, conditions, or restrictions the Master Plan places on these lots, we will not construe the Master Plan to create any restrictive covenants applicable to the Subject Property merely by implication. *See Post*, 125 Idaho at 475, 873 P.2d at 120.

Second, turning to the portions of the Master Plan that are available for review makes plain the absence of any clearly expressed conditions. For example, the Owner's Certificate says that it is "subject to the Declarations of Covenants and Restrictions of record." (Capitalization modified). Yet, on appeal, the parties have not contested the district court's finding that the CC&Rs were void when Vintage purchased its property. Thus, the CC&Rs were not applicable to the Subject Property. Additionally, the parties agree on appeal that the Master Plan is not a plat. Notwithstanding the "subject to" language from the Owner's Certificate, there are no "Covenants and Restrictions" specifying how Plaintiffs may use their land; therefore, the Owner's Certificate cannot reasonably be said to "clearly express" any restrictions.

Finally, turning to the graphic depictions and the "Area/Units/Density Tables" in the Master Plan, Vintage argues that "[a] table which proscribes averages or aspirations is insufficient to create a restrictive covenant under Idaho law because it lacks clear expression." We agree. Merely specifying the total number of lots in a projected phase is insufficient to establish a restrictive covenant. This is especially pertinent here because there was no further development on the project after 2009. In fact, the developer announced its decision to "give up on the development" in 2014 and sold part of it to Vintage. Where there was no specific language in the Master Plan placing restrictions on the land that had not yet been developed, we conclude that the graphic depiction and table in the Master Plan delineating how the land is intended to be used was merely aspirational—not binding. Therefore, it did not create a valid restrictive covenant that runs with the land.

For these reasons we hold that the district court erred in ruling that the Master Plan imposed any restrictive covenants or equitable servitudes that limited Plaintiffs' use of the Subject Property. Accordingly, the amended judgment must be vacated.

**C. The district court erred when it held the Master Plan included a common law dedication to the public.**

Vintage further argues that the district court erred when it concluded that the Master Plan contained a proper dedication of the subject property—shown as the four "Open Areas" in the Master Plan. They maintain that the Master Plan, the CC&Rs, and the surrounding circumstances do not indicate an intent to dedicate those areas as open space. They also argue that, even if there was an intent to dedicate the land for open space, there was no acceptance. Acceptance occurs when lots are "sold or otherwise conveyed with specific reference to the [pertinent] plat." *Worley Highway Dist. v. Yacht Club of Coeur d'Alene, Ltd.*, 116 Idaho 219, 225, 775 P.2d 111, 117 (1989). Teton Saddleback responds that the Master Plan, CC&Rs, and other circumstances evince an intent to dedicate the open spaces designated in the Master Plan. Furthermore, they assert that Plaintiffs did not raise any argument regarding lack of acceptance below; therefore, this Court should not consider it for the first time on appeal.

A dedication is an appropriation of real property "for the use or ownership of others." *Rowley v. Ada Cnty. Highway Dist.*, 156 Idaho 275, 278, 322 P.3d 1008, 1011 (2014) (quoting *Armand v. Opportunity Mgmt. Co.*, 141 Idaho 709, 714, 117 P.3d 123, 128 (2005)). "Land can either be dedicated to the public or to private persons." *Id.* (citing *Ponderosa Home Site Lot Owners v. Garfield Bay Resort, Inc.*, 139 Idaho 699, 701, 85 P.3d 675, 677 (2004)). A common law public dedication, which is alleged here, occurs when: (1) the landowner clearly and unequivocally indicates an intent to dedicate the land to the public, and (2) the public accepts the offer. *Id.*

As to the first requirement, "[i]n determining whether the owner intended to offer the land for dedication, courts must examine the plat, as well as 'the surrounding circumstances and conditions of the development and sale of lots." *Ponderosa Home Site Lot Owners*, 143 Idaho at 409, 146 P.3d at 675 (citing *Sun Valley Land & Minerals, Inc. v. Hawkes*, 138 Idaho 543, 548, 66 P.3d 798, 803 (2003)). "An owner's intent to dedicate land to public use 'must be clearly and unequivocally shown and must never be presumed.' " *Rowley*, 156 Idaho at 279, 322 P.3d at 1012 (quoting *Lattin v. Adams County*, 149 Idaho 497, 502, 236 P.3d 1257, 1262 (2010)), *abrogated on other grounds by E. Side Highway Dist. v. Delavan*, 167 Idaho 324, 470 P.3d 1134 (2019)). Meanwhile, the second requirement, acceptance, occurs "when the offer is acted upon and lots are purchased with reference to the plat filed by the offeror." *Ponderosa Home Site Lot Owners*, 143 Idaho at 409, 146 P.3d at 674 (quoting *Armand*, 141 Idaho at 715, 117 P.3d at 129). Once a

16

common law dedication occurs, "it has the legal effect of creating an easement in favor of the lot purchasers." *Id.*

As mentioned above, the parties agree that the Master Plan is not a plat. However, even assuming, arguendo, that the Master Plan had the legal effect of a plat, it still does not unmistakably demonstrate an intent to dedicate. As we have said before, "[l]abeling a parcel without designating ownership or whether the parcel is public or private does not show intent to dedicate land to the public." *Rowley*, 156 Idaho at 279, 322 P.3d at 1012. Here, all the Master Plan contains is a mere label over certain portions of land designating it as "open space." Any intent to dedicate must be found in the surrounding circumstances and conditions of the development and sale of lots. Thus, even if the Master Plan amounted to a plat, this label would be insufficient to demonstrate an intent to dedicate.

Having reviewed the record and the transcripts before us, any intention to dedicate land within the Subject Property would have to be presumed, which our case law has established cannot be the basis for a dedication. *See id.* at 278, 322 P.3d 1011; *Saddlehorn Ranch Landowners, Inc. v. Dyer*, 146 Idaho 747, 752, 203 P.3d 677, 682 (2009). Having failed to establish a clear intent to dedicate any open space, we need not reach the second element of acceptance and whether it was preserved for appeal.

### D. Teton Saddleback is not entitled to Costs or Attorney Fees.

Teton Saddleback requests costs pursuant to Idaho Appellate Rule 40, and attorney fees pursuant to Idaho Code section 12-121. Idaho Appellate Rule 40 allows us to award costs to the prevailing party on appeal as a matter of course, while Idaho Code section 12-121 provides for an award of attorney fees to the prevailing party when "the case was brought, pursued or defended frivolously, unreasonably or without foundation." I.C. § 12-121. However, given our decision to reverse the district court's order and vacate its amended judgment, Teton Saddleback is not the prevailing party on appeal. Therefore, its request for costs and attorney fees is denied.

It is unclear whether Vintage is seeking attorney fees on appeal. In its opening brief, Vintage references attorney fees in the table of contents and in a heading; however, it does not set forth a statutory basis for fees in the text of the brief. Under the heading "Attorney Fees on Appeal," the text contains only two sentences, both citing Idaho Appellate Rule 40(a), which pertains to costs on appeal—not attorney fees. Attorney fees on appeal are addressed in Rule 41, which requires an appellant to comply with Rule 35(a)(5) and (6). Rule 35(a)(5) states: "If the

appellant is claiming attorney fees on appeal the appellant must . . . state the basis for the claim," while Rule 35(a)(6) requires that an appellant's brief "contain the contentions of the appellant with respect to the issues presented on appeal, the reasons therefor, with citations to the authorities, statutes and parts of the transcript and record relied upon."

We have explained that even when a statutory basis for attorney fees is set forth, a request for attorney fees must also be coupled with an argument justifying the request: "a mere reference to the request for attorney fees is not adequate." *Goldman v. Graham*, 139 Idaho 945, 948, 88 P.3d 764, 767 (2004), citing *Weaver v. Searle Bros*., 131 Idaho 610, 616, 962 P.2d 381, 387 (1998) (holding that a "conclusory sentence" is inadequate because "[t]his Court will not consider issues cited on appeal that are not supported by propositions of law, authority or argument."). Because Vintage has failed to properly support its request for attorney fees, its request is denied. However, as the prevailing party, Vintage is entitled to recover its costs as a matter of course under Idaho Appellate Rule 40(a).

## IV.    CONCLUSION

For the reasons stated above, we affirm the district court's decision to admit the Master Plan into evidence at trial; however, we reverse the district court's conclusions that the Master Plan creates restrictive covenants and contains a common law dedication to the public. Accordingly, we vacate the amended judgment of the district court. Inasmuch as the district court has already determined that the CC&Rs are void, a conclusion that was not challenged on appeal, we remand this matter and direct the court to enter judgment in favor of the Plaintiffs. As the prevailing party, Vintage is awarded costs on appeal.

Chief Justice BEVAN, and Justices BRODY, ZAHN, and MEYER CONCUR.